## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MELVYN KLEIN, Derivatively on Behalf of Nominal Defendant REV GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> TIM SULLIVAN, PAUL BAMATTER, JEAN MARIE CANAN, DINO CUSUMANO, CHARLES DUTIL, JUSTIN FISH, KIM MARVIN, JOEL ROTROFF, and DONN VIOLA, <br><br> Defendants, <br><br> and <br><br> REV GROUP, INC., a Delaware Corporation, <br><br> Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No.: <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Melvyn Klein ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant REV Group, Inc. ("REV" or the "Company"), submits this Verified Stockholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by REV with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1. This is a stockholder derivative action brought on behalf of and for the benefit of REV, against certain of its officers and/or directors named as defendants herein seeking to remedy their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred from October 10, 2017 to the present (the "Relevant Period"). Defendants' actions have caused,

and will continue to cause, substantial financial harm and other damages to REV, including damages to its reputation and goodwill.

2.      This action relates to the Company's January 27, 2017 initial public offering (the "IPO") and secondary public offering on October 13, 2017 (the "SPO"). The IPO and SPO will be referred to collectively herein as the "Offerings."

3.      REV is a leading designer, manufacturer and distributor of specialty vehicles and related aftermarket parts and services.

4.      American Industrial Partners (together with its investment vehicles and funds, "AIP"), is a private equity firm specializing in the industrial sector. AIP purchases companies, then hopes to sell them for a profit either in a public offering or otherwise. As more fully discussed herein, AIP was (and is) the controlling stockholder of REV and was the private equity sponsor of REV at the time of the Offerings.

5.      Defendants Bamatter, Cusumano, Fish, Marvin, and Rotroff are all partners of AIP and are directors of REV.

6.      Since the IPO, REV through its officers and directors repeatedly represented to the investing public that they should expect continued margin growth from REV, and further that REV's efficiency of its manufacturing facilities would support this margin growth.

7.      To justify these representations of margin growth, in late September / early October of 2017 (and shortly before the SPO), REV's chief executive officer ("CEO") Tim Sullivan and Chief Financial Officer ("CFO") Dean Nolden had a meeting with the heads REV's reporting segments to discuss its upcoming guidance for fiscal year 2018 ("FY2018"). At the meeting, Sullivan and Nolan issued targets for FY2018 Adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA"). At this meeting, Sullivan and Nolden were told that REV could **not** achieve their proposed FY2018 Adjusted EBITDA guidance.

8.     Additionally, REV -- through its officers and directors -- knew or should have known that REV in fact lacked efficiencies in its manufacturing facilities, which further eroded the opportunity for margin growth and its proposed FY2018 Adjusted EBTDA guidance.

9.     On October 10, 2017, REV issued the FY2018 earnings guidance to the investing public that Sullivan and Nolden proposed at the earlier meeting (referenced in ¶ 7), and without making any adjustments based on the information provided at that meeting, or otherwise known to REV.

10.     On or about October 17, 2017, REV completed its SPO.  Through this SPO, AIP and defendants Cusumano, Fish, Marvin, and Rotroff sold approximately $300 million of REV stock (at approximately $27.25 per share).

11.     On March 7, 2018, REV announced its first quarter 2018 financial results and surprised the market by revealing that its margins and growth rates had contracted for the first time since its IPO five quarters prior.

12.     On March 8, 2018, REV stock price fell by 12% to close at $23.85 per share.

13.     On June 6, 2018 and after market close, REV substantially cut its FY2018 earnings guidance and reported 2Q18 earnings well below analysts' consensus.

14.     On June 7, 2018 and on this news, REV shares fell $3.39 per share (almost 20%) to close at $14.52 per share.

15.     The misconduct of REV and its officers and directors has subjected it to multiple securities class actions including *Rajaram v. REV Group, Inc., et al.*, Case No. 2:18-cv-1270-LA (E.D. WI) (the "Securities Class Action").

## JURISDICTION AND VENUE

16.     Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated

thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

17.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

18.    Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) REV maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to REV, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

19.    ***Plaintiff Melvyn Klein*** is a current REV stockholder during the Relevant Period. Plaintiff purchased REV stock directly on the initial public offering ("IPO"). Plaintiff will continue to hold REV shares throughout the pendency of this action. Plaintiff will fairly and adequately represent the interests of the stockholders in enforcing the rights of the corporation.

### Nominal Defendant

20.    Nominal Defendant REV designs, manufactures, and distributes specialty vehicles in the United States, Canada, Europe, Africa, the Middle East, and internationally. The Company is incorporated in Delaware and maintains manufacturing facilities in Los Angeles, California.

**Director Defendants**

21.     **Defendant Tim Sullivan** ("Sullivan) is the Chief Executive Officer and Director of the Company.  As stated in REV's Form DEF 14A filed with the SEC on January 24, 2018 (the "2018 Proxy Statement"), Sullivan has held those positions since August 2014.

22.     **Defendant Paul Bamatter** ("Bamatter") is the Chairman of the Board.   He has served as a member of the Board since 2016.  Bamatter is a member of the Compensation Committee and Chairman of the Nominating and Corporate Governance Committee.  Bamatter is also a Partner and Chief Financial Officer at AIP, an organization he joined in 2005.  Bamatter served as a Vice President and Secretary of REV and many of REV's subsidiaries from 2008 until 2016.

23.     **Defendant Jean Marie Canan** ("Canan") is a director of the Company.  He has served a member of the Board since August 2016.   Canan is the Chairman of the Audit Committee.

24.     **Defendant Dino Cusumano** ("Cusumano") is a director of the Company.  He has served as a member of the Board since 2008.  Cusumano is the Chairman of the Compensation Committee.   Cusumano is also a general partner at AIP, an organization he joined in 2000.  Cusumano was a Vice President of REV from 2008 until February 2016.

25.     **Defendant Charles Dutil** ("Dutil") is a director of the Company.  He has served as a member of the Board since 2016.  Dutil is a member of the Audit Committee.

26.     **Defendant Justin Fish** ("Fish") is a director of the Company.  He has served as a member of the Board since 2016.  Fish is a member of the Nominating and Corporate Governance Committee.  Fish is a partner at AIP (AIP indirectly own approximately 90% of the Company's voting equity).

27.     **Defendant Kim Marvin** ("Marvin") is a director of the Company.  He has served as a member of the Board since 2008.  Marvin is a general partner at AIP, an organization he joined in 1997.

28.     **Defendant Joel Rotroff** ("Rotroff") is a director of the Company.  He has served as a member of the Board since 2016.  Rotroff is a member of the Nominating and Corporate Governance Committee.  Rotroff joined AIP in 2012.

29.     **Defendant Donn Viola** ("Viola") is a director of the Company.   He has served as a member of the Board since 2008.   Viola is a member of the Audit Committee and the Compensation Committee.

30.     Defendants Sullivan, Bamatter, Canan, Cusumano, Dutil, Fish, Marvin, Rotroff, and Viola are collectively referred to herein as the "Director Defendants".

## REV CORPORATE GOVERNANCE

31.     As members of REV's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

32.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of REV, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

33.     REV maintains a Code of Conduct, which it identifies on its website as "Policy No. HR-E3-B and with a January 26, 2017 effective date.  This Code of Conduct provides in relevant part:

> **SPECIFIC:** The Code of Conduct, as presented below, specifies the high standard of business conduct and integrity that is required from each employee. All employees must have full knowledge of the policies and standards of conduct that they are expected to comply with […]
>
> * * *
>
> **Conflicts of Interest.**

6

<u>Conflicts of Interest</u>. We, at REV, are expected to act in accordance with the highest standards of personal and professional integrity and to comply with all applicable laws, regulations, and REV policies and procedures. We must never compromise that integrity, either for personal benefit or REV's benefit […]

\* \* \*

<u>Corporate Opportunities</u>. Employees, officers and directors are prohibited from taking for themselves business opportunities that are discovered through the use of corporate property, information or position. No employee, officer or director may use corporate property, information or position for personal gain […]

\* \* \*

**<u>Accurate Accounting Records and Public Disclosures</u>**
The Company requires full compliance with the applicable laws and regulations which require us to maintain books and records which, in reasonable detail, accurately and fairly reflect business transactions and the disposition of assets. The Company has a responsibility to provide full and accurate information in its public disclosures, in all material respects, about the Company's financial condition and results of operations. The Company will maintain a system of internal controls sufficient to provide reasonable assurance that transactions are executed and recorded in accordance with standard accounting principles. Refer to various policies in the accounting policy section. The Company's reports and documents filed with or submitted to the Securities and Exchange Commission and our other public communications shall include full, fair, accurate, timely and understandable disclosure.

**<u>Insider Trading Policy</u>**

34.     REV maintains an Insider Trading Policy which it identifies on its website as "Policy No. LG-13.  This Insider Trading Policy provides in relevant part:

**APPLICATION**: This Policy applies to all officers, directors and employees of the Company and its subsidiaries […]

**GENERAL**: The Company's Board of Directors has adopted this Policy to promote compliance with U.S. federal, state and foreign securities laws that prohibit certain persons who are aware of material nonpublic information about a company from: (i) trading in securities of that company; or (ii) providing material nonpublic information to other persons who may trade on the basis of that information.

**SPECIFIC:**

1. <u>Transactions Subject to the Policy</u>. This Policy applies to transactions in the Company's securities (collectively referred to in this Policy as "Company

7

Securities"), including the Company's common stock, options to purchase common stock, restricted stock units or any other type of securities that the Company may issue, including, but not limited to, preferred stock, convertible debentures and warrants, as well as derivative securities that are not issued by the Company, such as exchange-traded put or call options or swaps relating to the Company's securities.

2. <u>Individual Responsibility</u>. Persons subject to this Policy have ethical and legal obligations to maintain the confidentiality of information about the Company and to not engage in transactions in Company Securities while in possession of material nonpublic information. Each individual is responsible for making sure that he or she complies with this Policy, and that any Related Persons also comply with this Policy. In all cases, the responsibility for determining whether an individual is in possession of material nonpublic information rests with that individual, and any action on the part of the Company, the Legal Organization or any other employee or director pursuant to this Policy (or otherwise) does not in any way constitute legal advice or insulate an individual from liability under applicable securities laws. You could be subject to severe legal penalties and disciplinary action by the Company for any conduct prohibited by this Policy or applicable securities laws, as described below in more detail under the heading "Consequences of Violations."

3. <u>Statement of Policy</u>. It is the policy of the Company that a director, officer or other employee of the Company (or any other person designated by this Policy or by the General Counsel as subject to this Policy) who is aware of material nonpublic information relating to the Company may not, directly, or indirectly through Related Persons:

- engage in transactions in Company Securities, except as otherwise specified in this Policy under the headings "Transactions Under Company Plans," "Transactions Not Involving a Purchase or Sale" and "Rule 10b5-1 Plans;" […]

\* \* \*

While it is not possible to define all categories of material information, some examples of information that ordinarily would be regarded as material are:

- projections of future earnings or losses, or other earnings guidance […]

**<u>Audit Committee Charter</u>**

35.     Pursuant to the Company's Audit Committee Charter, the purpose of the Audit Committee is to assist the Board with oversight of the Company's accounting and financial reporting processes and the audit of the Company's financial statements.

36.     The Audit Committee Charter states in relevant part:

8

**Financial Reports**

*General* — The Committee is responsible for overseeing the Corporation's financial statements and financial disclosures. For the avoidance of doubt, such financial statements and disclosures to be reviewed shall not include the Corporation's interim monthly financial statements. Management is responsible for the preparation, presentation and integrity of the Corporation's financial statements and financial disclosures and for the appropriateness of the accounting principles and the reporting policies used by the Corporation. Management and the Corporation's internal audit department is also responsible for establishing effective internal controls and procedures to ensure the Corporation's compliance with accounting standards, financial reporting procedures and other Applicable Requirements. The auditors are responsible for auditing the Corporation's annual consolidated financial statements and for reviewing the Corporation's unaudited interim financial statements and for providing an unbiased, diligent review of the effectiveness of the Corporation's internal controls. Each member of the Committee shall be entitled to rely on (i) the integrity of those persons and organizations within and outside the Corporation from whom it receives information and (ii) the accuracy of the financial and other information provided to the Committee by such persons or organizations absent actual knowledge to the contrary (which shall be promptly reported to the Board).

*Review of Financial Reports* — The Committee shall review the Corporation's: (i) annual consolidated audited financial statements, and the auditors' report thereon; (ii) interim consolidated financial statements, and any reports of the auditors with respect thereto; (iii) the related management's discussion and analysis of the Corporation's financial condition and results of operation ("MD&A"); and (iv) earnings releases and guidance. If advisable, the Committee shall approve and recommend for Board approval the financial statements and MD&A. The Committee shall discuss with management and the external auditor their judgment about the quality of accounting principles, the reasonableness of significant judgments, including a description of any transactions as to which the management obtained Statement on Auditing Standards No. 50 letters, and the clarity of disclosures in the financial statements, including the Corporation's disclosures of critical accounting policies and other disclosures under "MD&A."

*Review Considerations* — In conducting its review of the annual financial statements or the interim financial statements, the Audit Committee shall:

(i)     meet with management and the external auditors to discuss the financial statements and MD&A, and any factors that may affect future financial results;

(ii)    discuss with management, the auditors and legal counsel, as requested, any litigation claim or other contingency that could have a material effect on the financial statements;

(iii)   discuss with management and the auditors and review the critical accounting policies followed (including any significant changes in the selection or

9

application of accounting principles), the effects of alternative GAAP methods, off-balance sheet structures and regulatory and accounting initiatives and other significant estimates and judgements underlying the financial statements as presented by management;

(iv)    review management's report on the effectiveness of internal controls over financial reporting;

(v)    review any finance-related reports received through the Corporation's audit committee whistleblower procedures; and

(vi)    review any other matters and reports related to the financial statements that are brought forward by the auditors, management or which are required to be communicated to the Committee under accounting policies, auditing standards or Applicable Requirements.

*Approval of Other Financial Disclosures* — The Audit Committee shall review and, if advisable, approve and recommend for Board approval financial disclosure in a prospectus or other securities offering document of the Corporation, press releases disclosing, or based upon, financial results of the Corporation and any other material financial disclosure, including any earnings or financial guidance provided by the Corporation to analysts, rating agencies, regulatory authorities or otherwise publicly disseminated, paying particular attention to the use of non-GAAP financial information.

\* \* \*

### Internal Controls

The Audit Committee shall require management to implement and maintain appropriate systems of internal controls in accordance with Applicable Requirements, including internal controls over financial reporting and disclosure. The Committee, with the assistance and input of management and the auditors, as requested, shall periodically review and evaluate and shall approve significant changes to such systems of internal controls. The Committee shall also consider and review any significant issues and recommendations of the auditors together with management's responses thereto, including the timetable for implementation of recommendations to correct weaknesses in internal controls over financial reporting and disclosure controls.

### Compliance with Legal and Regulatory Requirements

The Audit Committee shall review reports received from management on legal or compliance matters with respect to financial matters; the effectiveness of the Corporation's compliance policies; and any material communications received from regulators. The Committee shall, in conjunction with the Chief Executive Officer and Chief Financial Officer, review the Company's disclosure controls and procedures and internal control over financial reporting. The review of internal control over financial reporting shall include whether there are any significant

deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to affect the Company's ability to record, process, summarize and report financial information and any fraud involving management or other employees with a significant role in internal control over financial reporting. The Committee shall also review any special audit steps adopted in light of material control deficiencies.

\* \* \*

### Risk Management Oversight, Privacy and Data Security

The Audit Committee shall periodically review and discuss with management the principal business risks associated with the Corporation's business, including financial, operational, privacy, security, business continuity, legal and regulatory and reputational risks (but excluding human resources and health and safety which shall be within the purview of another committee), as well as management's implementation of appropriate systems to identify, assess, manage and monitor these risks. The Audit Committee shall also periodically review the decisions, practices, activities, and control and management information systems related to those risks that have been established by management. The Audit Committee shall also periodically, and at least twice per fiscal year, review the risk management chart of the Corporation prepared by the management with respect to those risks….

## DUTIES OF THE DIRECTOR DEFENDANTS

37.     By reason of their positions as officers, directors, and/or fiduciaries of REV and because of their ability to control the business and corporate affairs of REV, the Director Defendants owed the Company and its stockholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage REV in a fair, just, honest, and equitable manner.  The Director Defendants were and are required to act in furtherance of the best interests of REV and its stockholders so as to benefit all stockholders equally, and not in furtherance of their personal interest or benefit.

38.     Each director and officer of the Company owes to REV and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, financial condition, and present and future

business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

39. The Director Defendants, because of their positions of control and authority as directors and/or officers of REV, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with REV, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of REV.

40. To discharge their duties, the officers and directors of REV were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of REV were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how REV conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(e)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

41.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of REV, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

42.     In addition, as officers and/or directors of a publicly held company, Defendants had a duty not to advance their own personal, financial, or economic interests over, and at the expense of, the Company's public stockholders, or to allow other REV directors, officers, and/or employees to do so.  Each director and officer of the Company also owed REV and its stockholder-owners the duty to maintain the Company's confidential information and prevent others from misappropriating and/or trading while in possession of the Company's proprietary, confidential information.

43.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed infra.  The Director Defendants' subjected the Company to the costs of defending, and the potential liability from, the securities

13

class action (and related lawsuits). As a result, REV has expended, and will continue to expend, significant sums of money.

44.     The Director Defendants' actions have irreparably damaged REV's corporate image and goodwill.

## COMPANY BACKGROUND AND INFORMATION

45.     REV is a leading designer, manufacturer and distributor of specialty vehicles and related aftermarket parts and services.

46.     REV was formerly known as Allied Specialty Vehicles ("ASV") and changed its name to Rev Group, Inc. on November 1, 2015. ASV was formed in 2010 from the merger of four American Industrial Partners companies.

47.     American Industrial Partners (together with its investment vehicles and funds, "AIP"), is a private equity firm specializing in the industrial sector. Defendants Bamatter, Cusumano, Fish, Marvin, and Rotroff are all partners of AIP and are directors of REV.

48.     AIP exerted control over REV before, during, and after the Offerings. AIP owned approximately 90% of REV's voting common stock prior to the IPO. Immediately following the IPO, AIP owned at least 70% of the Company's outstanding common stock. Following the SPO, AIP continued to own and control a majority of REVG's voting stock.

49.     In its 2017 Form 10-K filed with the SEC on December 21, 2017 (the "2017 10-K"), REV states that it is a "controlled company" within the meaning of the New York Stock Exchange rules and, as a result, qualifies for, and relies on, exemptions from certain corporate governance requirements. In the 2017 10-K, REV admits that it is utilizing these exemptions and states: "As a result, we do not have a majority of independent directors on our Board of Directors. In addition, our compensation committee and our nominating and corporate governance committee do not consist entirely of independent directors or be subject to annual performance evaluations."

14

50.     Additionally, AIP and REV are parties to a shareholders agreement[1] that gave AIP outsized influence and control over REV so long as AIP beneficially owns at least 15% of the outstanding shares of REV's common stock.   Under this shareholders agreement, AIP's rights include (but are not limited to):

(a)     to nominate the greater of five members of the Board of Directors or a majority of directors;

(b)     to designate the Chairman of our board of directors and one member to each of the audit committee, the compensation committee and the nominating and corporate governance committee;

(c)     to approve amendments to the amended and restated certificate of incorporate and amended and restated bylaws that would change the name of the Company, its jurisdiction of incorporation, the location of its principal executive offices, the purpose or purposes for which the Company is incorporated or the approval requirements as provided in the Shareholders Agreement;

(d)     to approve any merger, amalgamation or consolidation of the Company or the spin-off of a business of the Company with assets in excess of 15% of the consolidated assets or revenues of the Company and its subsidiaries;

(e)     to certain information rights, including the right to consult with and advise senior management, to receive quarterly and annual financial statements and to review our books and records.

51.     REV operates and reports its financial results from three segments:

(a)     Commercial - which manufactures transit and shuttle buses, Type A school buses, mobility vans, sweepers, and terminal trucks;

---

[1]     The Amended and Restated Shareholders Agreement is attached as Exhibit 10.1 to the Company's Form S-1/A filed with the SEC on January10, 2017.

(1)     REV's Commercial segment provided approximately 27% of the Company's revenues in 2017;

(2)     REV's Commercial segment is comprised of four smaller units: Commercial Bus (8%), Transit Bus (7%), Type A School Bus (6%), and Specialty (6%)[2]. Thus, buses account for approximately 80% of the Commercial segment in FY 2017.

(3)     On information and belief, CW1 was President of REV's Bus division from June 2015 through November 1, 2017.

(b)     Recreation - which manufactures motorized RV products;

(1)     the Company's Recreation segment provided approximately 29% of the Company's revenues in 2017.

(2)     On information and belief, Jim Jacobs ("Jacobs") was the RV Group president (Recreational Segment).

(c)     Fire and Emergency ("F&E") - which manufactures fire trucks and ambulance-related products.

(1)     F&E provided approximately 44% of the Company's revenues in 2017.

52.     REV records income for each vehicle it sells on a cash accounting basis. It does not recognize revenue or earnings until an ordered vehicle is completed and shipped. In order to track its future earnings, each REV manufacturing facility records the vehicle's sale price in what the Company called its "backlog" at the date of sale.   As the vehicle moves through the production line, the backlog period for that vehicle decreases to a period of zero days on the date the vehicle is shipped.

(a)     REV's vehicles have substantial lead times ranging from two to twelve months. After a customer orders a vehicle, REV cannot recognize revenue until the vehicle

---

[2]     *See* 2017 Form 10-K, p. 3.

16

is finished and shipped two to twelve months later. REV continually claimed that these long lead times gave the Company strong visibility into future financial results.  For example:

(1)     In the IPO Prospectus, REV stated that "our business carries a high-quality backlog which enables strong visibility into future net sales which ranges from two to nine months depending on the product and market. This visibility into future production needs and net sales enables us to more effectively plan and predict our business."

(2)     In the SPO Prospectus, REV stated that "[its] business carries a high-quality backlog which enables strong visibility into future net sales which ranges from two to twelve months depending on the product and market. This visibility into future production needs and net sales enables us to more effectively plan and predict our business."

(3)     In its 2017 10-K, REV stated that "[o]ur business carries a high-quality backlog which enables strong visibility into future net sales which ranges from two to twelve months depending on the product and market. This visibility into future production needs and net sales enables us to more effectively plan and predict our business."

(b)     The amount of time that a REV vehicle remained in backlog depended on several factors including the size and complexity of the vehicle. Large and customized vehicles, such as large commercial buses, custom fire apparatus and certain RVs (such as Class A vehicles), bus and ambulance products, take longer to build and, thus, remain in backlog for a longer period of time.

53.     REV tracked its backlog continuously.   As recounted in the Securities Class Action:

(a)     Three former REV employees stated that the Company had a centrally managed system to accurately track backlog.

(b)     Confidential Witness ("CW") 1 was President of REV's Bus division from June 2015 through November 1, 2017. REV Bus created product for several bus brands, including Collins Bus, Goshen Coach, ENC, ElDorado National, Krystal Coach, Federal Coach, Champion, and World Trans.  REV Bus made buses that ranged from small vehicles built off truck chassis to large city buses built on custom chassis manufactured by REV.

(c)     CW1 reported that REV had a system, which was Company-wide and used at the Milwaukee corporate headquarters, to track backlog called OneStream. CW1 reported that OneStream was similar to Microsoft Excel and provided data about REV's production schedule.

(d)     CW1 stated that REV's backlog not only informed the Company about revenues but gave Defendants enough information to determine sales mix.  CW1 also stated that REV executives were well aware of the profit margins on Company vehicles.

(e)     CW1 stated that REV's senior management were well aware of what vehicles were in the Company's backlog through its use of OneStream. CW1 stated that all hard backlog was entered into OneStream, allowing the Milwaukee corporate management team clear visibility as to what products were in the pipeline and when they would be completed.  Hard backlog was the term used for the orders that were taken, signed off on, and ready for production. According to CW1, "[i]n OneStream we could see in an Excel sheet, it showed what the backlog was, and what production was for each plant."

(f)     CW2 worked as a finance manager at REV's ElDorado Bus and Mobility subsidiary from May 2017 to mid-November 2017.  ElDorado is one of REV's eight brands in its Recreation segment.  CW2 was based at REV's Salina, Kansas

production plant. CW2 ran the business department at ElDorado and supervised the controller, two accounts payable clerks, one accounts receivable clerk, one cost accountant, and the Information Technology department.

(g)   CW2 corroborated CW1's statements about OneStream. CW2 stated that at REV's ElDorado subsidiary, backlog was tracked on a monthly basis through OneStream. Like CW1, CW2 described OneStream as similar to Microsoft Excel, with various fields in which to enter data. CW2 inputted data each month into OneStream, including into fields such as "work in progress," "backlog," "finished goods," and "inventory." CW2 had to input such data by the 10th of every month. When a vehicle was finished, it would go from "work in progress" to "finished goods." "Work in progress" provided a total showing how far along towards completion the vehicles in the manufacturing facility were. Senior management could tell what vehicles were being built, and how far along they were, because each manufacturing facility built only certain vehicles. In other words, when OneStream listed a certain number of vehicles from one REV manufacturing facility, it was clear that those vehicles were of a certain kind, e.g., buses, ambulances, etc.

(h)   CW2 stated that senior management in Milwaukee used the OneStream data from the various REV manufacturing facilities when making projections. Every three months, senior REV management would give specific projections to each of REV's manufacturing facilities.

(i)   CW2 stated that, after receiving these projections from CW2's general manager Colby Bertrand, it was CW2's responsibility to update the projections by adding three months to the existing, rolling 12-month projections. CW2 would also have to show how CW2's facility would meet the projection.

19

(j)     CW2 stated that the projections which CW2's facility received from corporate headquarters in Milwaukee were regularly unreachable. For example, CW2 stated that senior management's FY2018 projections for CW2's manufacturing facility demanded that it grow its production by 5-10% while reducing its costs by the same amount. CW2 stated that this was impossible because CW2's facility was already operating at maximum production level – and with serious inefficiencies, including large amounts of overtime and resulting mushrooming costs.

(k)     Because REV carefully tracked backlog through OneStream at its corporate headquarters in Milwaukee, the Director Defendants always knew the sales mix for REV's vehicles in production.

54.     REV also tracked efficiencies at its facilities and was informed of various manufacturing and supply issues. As recounted in the Securities Class Action, which detailed the efficiency problems:

(a)     CW 3 worked as a brand manager for REV's Wheeled Coach Industries from December 2015 to April 2017. Wheeled Coach is one of the eight ambulance brands within REV's F&E segment. CW3 was based at REV's Winter Park, Florida facility. CW3 reported to the Senior Vice President of Sales for the REV Ambulance Group. CW3's role as a brand manager for REV Ambulance Group Orlando's Wheeled Coach line was primarily focused on sales. CW3 served as an account manager for several Wheeled Coach dealerships.

(b)     CW3 reported many inefficiencies at the Winter Park facility. For example, CW3 stated that information was often not accurately transferred from sales to engineering to production. As a result, workers would regularly not build vehicles to specification. This caused delays in production because workers would have to go back and re-build. CW3 also stated that CW3 would sometimes have to ask

customers if they would accept the vehicle with specifications different than they had ordered for a discounted price.

(c)     CW3 also stated that, to keep the production line fed, Wheeled Coach opted to pre-build ambulances that had not yet been ordered to specification.  CW3 stated that this way of working frequently led to costly rework when the detailed requirements were received.  CW3 also stated (corroborating CW1's statement) that REV's Ambulance lines often competed with each other on deals.

(d)     CW3 reported other inefficiencies at the Winter Park facility. CW3 stated that there was a constant "burn and churn" of both skilled workers and returned ambulances at the ambulance production facility in the Winter Park facility.

(e)     CW3 also reported that ongoing labor problems increased chassis costs significantly per unit due to repainting.  CW3 stated that paint quality was always off. "We were trying to keep up [with] painting and paint rework," CW3 said. "But it was not a new problem, not an event. It's abnormal there, if you look at the production line and the paint facility." CW3 said the workers at the paint facility were asked to do too much in too little time, resulting in frequent and costly errors. "You can tell the workers to work harder, then you have tired workers who make mistakes," CW3 said. "You continually require rework." "I don't think there was a labor shortage in the area, there was a lack of willingness to hire." "It was a burn and churn environment: hire, fire."

(f)     CW4 worked as a design engineer for the REV's Specialty Products division, part of the REV's Commercial segment, from March 2017 to October 2017. CW4 was recruited to work for REV by AIP.  Based in Longview, Texas, CW4 reported to Director of Engineering Specialty Products, Andrew Cooper.

(g)     CW4 directed one senior designer, as well as other designers and drafters. It was CW4's responsibility to interpret the project's design goals and set design

21

objectives for each project. CW4 provided initial design layouts and follow-up and helped prepare renderings of products. CW4 conferred regularly with his colleagues on the shop floor to ensure his design concepts made sense from a manufacturing perspective. CW4 was designing products for the specialty product division, which was part of REV's Commercial segment.

(h)    Like CW3, CW4 described profound inefficiencies at REV. CW4 stated that "the whole thing was inefficient, from getting the parts to putting the parts in." Even after desperately needed items arrived at the plant, no one ever seemed to know where the deliveries were located, CW4 recalled. "We had the parts arrive, but no one could attack because the inventory system was so bad."

(i)    CW4 reported other serious problems. When CW4 started work for REV, CW4 reported to an engineering manager who was suddenly either fired or laid off a couple months into his tenure. After the manager left the company, CW4 was simply instructed to report to the director of engineering instead. After moving to a new location, CW4 was dismayed to find that the work environment was miserable, with high turnover and low employee morale. "It was a bad work environment," CW4 recalled. "Low pay, high stress, and lots of responsibility, but no authority to make anything happen."

(j)    CW4 stated that CEO Timothy Sullivan was a hands-on chief executive who made occasional stealthy stops to observe the Longview manufacturing operation first-hand. CW4 stated that Sullivan was involved in the day-to-day operations of its REV facilities. CW4 was told by supervisors on occasion that Sullivan had stopped by. CW4 stated that Sullivan "visited unannounced a couple times." "Management knew he was coming, but no one said anything."

55.     Prior to issuing its financial guidance for any financial period, REV's management team met to first get accurate and reliable information.   As recounted in the Securities Class Action:

(a)     Each month, REV's nine-person management team met at the Company's headquarters in Milwaukee, Wisconsin and discussed REV's financial guidance (the "Monthly Financial Meetings").

(b)     The five executives who attended the Monthly Financial Meetings were: CEO Sullivan, CFO Nolden, Marcus Berto (Executive Vice President and Chief Commercial Officer), Tom Phillips (Chief Operating Officer (from July 2015 to November 2017)), and Pamela Krop (General Counsel (from January 2016 to June 2018)).

(c)     The four non-executive members of the senior management team who attended the Monthly Financial Meetings were: Dan Peters, REV Fire Group President; Robert Collins, REV Ambulance Group President (Peters and Collins represented the Company's F&E Segment); CW1, who was President of the REV Bus division (Commercial Segment); and Jim Jacobs, REV RV Group's President (Recreational Segment) (collectively, the "Segment Heads").

(d)     At the Monthly Financial Meetings, the Segment Heads and the executives discussed REV's 18-month rolling forecast. "We'd say here's what next 12 months look like," CW1 said.   CW1 stated that the group discussed rolling forecasts during the Monthly Financial Meetings.

56.     Earnings growth was central to REV's value.  From fiscal year 2015 through fiscal year 2017, REV reported strong growth. In those years, REV's Adjusted Net Income and Adjusted EBITDA was:

|  | **2015** | **2016** | **2017** |
|---|---|---|---|
| **Adjusted Net Income** | $34 million | $53 million | $76 million |

23

| **Adjusted EBITDA** | $90 million | $123 million | $163 million |
| --- | --- | --- | --- |

57.     Analysts were "sold" on REV's growth story.  As examples, a December 19, 2017 Wells Fargo report stated that the "company realized significant growth yr/yr.  Looking forward, management expects growth to continue…", and a December 20, 2017 Deutsche Bank report stated that "F&E organic growth accelerated to +14% Y/Y on tougher comps, 2) Recreation organic growth also accelerated to +19% Y/Y, and 3) Recreation margins improved 420bps Y/Y; this level of improvement seems sustainable into 2018."

## MATERIALLY FALSE AND MISLEADING STATEMENTS

58.     On October 24, 2016, REV filed a registration statement on Form S-1 with the SEC in connection with its IPO.  The registration statement was amended, with the final amended registration statement filed on January 17, 2017 on Form S-1/A (collectively, the "Registration Statement").  The Registration Statement was declared effected by the SEC on January 26, 2017.

59.     The Registration Statement contained a preliminary prospectus. The final prospectus was dated January 26, 2017 (the "Prospectus").  The Prospectus was filed with the SEC on January 30, 2017.

60.     The Prospectus trumpeted REV's production efficiencies, stating that "[w]e believe that our factories are among some of the most efficient and lowest cost production facilities in each of our markets due to the production processes that we employ, our purchasing scale and the high unit volume throughput relative to most of our competitors."

61.     On or about January 27, 2017, the Company completed its IPO, selling about 12.5 million shares at $22 per share and raising approximately $275 million in proceeds.

62.     After completing this IPO, AIP owned approximately 45,834,841 shares of REV's common stock, which represented approximately 72% of the Company's total outstanding shares of common stock.

63.     On information and belief, before issuing its full year fiscal 2018 ("FY2018") guidance (*see* ¶64, *infra*), REV participated in a Monthly Financial Meeting. As recounted in the Securities Class Action:

(a)     CW1 stated that CW1 attended a Monthly Financial Meeting in late September or early October 2017. At this meeting, the Segment Heads were presented with a forecast for FY2018 Adjusted EBITDA in the range of $200 to $220 million.

(b)     At the late September / early October 2017 Monthly Financial Meeting, the group was told that "all the numbers rolled up to this, where for 2018, bus you do this X amount, RV you do this amount." CW1 was told that REV's Bus division had to hit an unreachable EBITDA target for FY2018. CW1 advised that REV Bus was on track to hit a lower target, but Sullivan and Nolden wanted CW1 to commit to a materially higher figure.

(c)     At the late September / early October 2017 Monthly Financial Meeting, CW1 told the group that there was no plan to support the FY2018 earnings guidance (which was the same as that ultimately issued on October 10, 2017).

(d)     CW1 stated that REV's executive leadership set EBITDA (or profit) margin goals of 10 percent for each of the Company's divisions.

(e)     CW1 stated that the FY2018 earnings guidance given at the September or early October 2017 Monthly Financial Meeting was unobtainable as REV Bus could not reach a 10% EBITDA margin because, among other reasons:

(i)     A five-year contract for 350 buses a year for the next five years with one of REV's Bus brands, Collins Bus, fell through in 2017 (well before the late September/early October 2017 Monthly Financial Meeting), adversely affecting the FY2018 earnings guidance. CW1 personally worked on the Collins contract.

(ii)     Collins Bus could barely expand its market share because it already had such a large share of the school bus market. CW1 stated that in the 7,000-unit short school bus market, 6,000 of which are sold in North America each year, Collins was already delivering 2,800 units annually.

(f)     CW1 also stated that the FY2018 earnings guidance given at the September or early October 2017 Monthly Financial Meeting was unobtainable because (i) some of REV's plants were already operating at capacity; and (ii) REV's growth was limited because it had acquired so many other companies, particularly in the Ambulance division, that it was often competing with itself, something CW1 learned at Monthly Financial Meetings where the budgets and targets for each segment were discussed.

(g)     CW1 stated that at the late September/early October Monthly Financial Meeting, CW1 told Sullivan and the other corporate executives that REV's proposed FY2018 earnings guidance was not achievable. CW1 said, "I was not in agreement with what they wanted to do, and I told them."

(h)     As with CW1, Jim Jacobs, REV's RV Group President (Recreation Segment), told the group at the late September/early October Monthly Financial Meeting that his portion of the earnings guidance was unreachable. CW1 said Jacobs' point of contention hinged on corporate's expectations of the Decatur plant, which made Jacobs' target impossible based on Jacobs' experience at the Company. CW1 stated that REV's Decatur facility (in its RV division) had been performing poorly.

(i)     CW1 stated that both CW1 and Jacobs strongly argued that the Commercial and Recreational segments' share of the FY2018 earnings guidance was unobtainable.

(j)     After the meeting, CW1 received an email from Defendant Sullivan that said, "let's meet at 7." At that meeting, Sullivan informed CW1 that if CW1 was not

26

going to go along with the plan, CW1's further employment at REV was not going to work.

(k)     CW1 explained that the Segment Heads who did not go along with the FY2018 earnings guidance were driven out of the Company by Sullivan.

(l)     CW1 would not support the unachievable FY2018 earnings forecast and instead left the Company on November 1, 2017.

(m)     CW1 stated that Jacobs left REV for the same reason on November 1, 2017.

64.     On October 10, 2017, REV published a press release entitled "REV Group, Inc. Provides Outlook for Full-Year Fiscal 2018". In the press release, REV stated that FY2018 net income would be in the range of $85 million to $100 million and FY2018 adjusted EBITDA would be in the range of $200 million to $220 million.[3]

65.     In this October 10, 2017 press release, REV further stated, "REV Group is forecasting growth in all three of its reportable segments [Commercial, Recreation, and F&E] in fiscal 2018 . . . ."

66.     On October 10, 2017, the Company filed a Form S-1 registration statement for the SPO with the SEC (the "SPO Registration Statement"), which was declared effective on October 12, 2017.

---

[3]     In this press release, REV includes a note regarding non-GAAP measures and explained why it uses adjusted EBITDA stating, "REV Group reports its financial results in accordance with U.S. generally accepted accounting principles ("GAAP"). However, management believes that the evaluation of REV Group's ongoing operating results may be enhanced by a presentation of Adjusted EBITDA, which is a non-GAAP financial measure. Adjusted EBITDA represents net income before interest expense, income taxes, depreciation and amortization as adjusted for certain non-recurring, one-time and other adjustments which REV Group believes are not indicative of its underlying operating performance.

REV Group believes that the use of Adjusted EBITDA provides additional meaningful methods of evaluating certain aspects of its operating performance from period to period on a basis that may not be otherwise apparent under GAAP when used in addition to, and not in lieu of, GAAP measures."

67. On October 13, 2017, the Company filed the prospectus for the SPO on Form 424B4, which incorporated and formed part of the Registration Statement (together with the SPO Registration Statement, the "SPO Prospectus").[4] The SPO was priced at $27.25 per share by REV.

68. The SPO Prospectus also trumpeted REV's production efficiencies, stating that "[w]e believe that our factories are among some of the most efficient and lowest cost production facilities in each of our markets due to the production processes that we employ, our purchasing scale and the high unit volume throughput relative to most of our competitors."

69. The SPO Prospectus also stated:

**Our Growth Strategies**

We plan to pursue several strategies to grow our earnings, expand our market share and further diversify our revenue stream, including: Drive Margin Expansion Through Controllable Operational Initiatives—Our focus on driving operational improvement initiatives across the organization has enabled the increase of our net income and Adjusted EBITDA margins by 148 basis points and 280 basis points, respectively, from fiscal year 2014 to fiscal year 2016.

\* \* \*

Commercial Markets REV's Commercial segment addresses a broad variety of products and end markets. The transit and shuttle bus market includes applications such as airport car rental and hotel/motel shuttles, paramedical transit vehicles for hospitals and nursing homes, tour and charter operations, daycare and student transportation, mobility vans for wheelchair users, and numerous other applications. According to industry sources, shipments of cutaway buses (those buses that are up to 35 feet in length) were approximately 14,400 units in 2016. **_We believe the commercial bus markets we serve will sustain positive long-term growth_** supported by growing levels of urbanization which will require increasing commercial bus usage, increased government transportation spending as shown in the chart below, an aging and growing U.S. population driving demand for shuttle buses and mobility vans, a necessary replacement cycle of public and private bus customers and the introduction of new bus products." [Emphasis added]

---

[4]     The IPO Prospectus and SPO Prospectus are collectively referred to as the "Prospectuses."

70. Through this SPO (and while REV's stock price was artificially inflated due to Defendants' false and misleading statements), Company insiders including AIP and defendants Marvin, Fish, Cusumano, and Rotroff, sold approximately $300 million worth of REV stock (11.5 million shares at $27.25 per share). REV received none of the sale proceeds. Also, on October 17, 2017 Defendants Cusumano and Marvin sold about 25% of their individual REV holdings for proceeds of over $1.2 million each.

71. On December 19, 2017 REV published a press release entitled "REV Group, Inc. Reports Fiscal 2017 Fourth Quarter and Full Year Results". In that press release, REV stated in relevant part:

> We are reaffirming our REV Group full-year fiscal 2018 outlook that was released in early October. We expect full-year 2018 revenues of $2.4 to $2.7 billion and Adjusted EBITDA of $200 to $220 million. We are also reaffirming our expectation for full year 2018 net income to be in the range of $85 to $100 million, said Sullivan. "This outlook does not include any impact from potential changes in U.S. tax policy and rates, which we believe will be beneficial.

72. This press release also quoted Defendant Sullivan, who stated in relevant part:

> I am proud to report 18 percent sales growth and 32 percent growth in Adjusted EBITDA in 2017, but even more importantly, I am pleased to report that all three of our segments continue to have strong outlooks. We plan to continue this trajectory of earnings growth in excess of sales growth into next year. In summary, it was a strong quarter and year, we are well positioned for continued growth in fiscal 2018 and we will continue to make progress towards our enterprise-wide EBITDA margin goal of 10 percent.

73. On December 20, 2017, REV held its 4Q 2017 conference call. During this call, Defendant Sullivan reiterated REV's FY2018 earnings guidance. Sullivan also responded to questions about REV's guidance, growth and margins. This exchange states in relevant part:

> *Sullivan*:
>
> First and foremost, we are reiterating, today, guidance that we presented in October during our follow-on, which is net sales of $2.4 billion to $2.7 billion and adjusted EBITDA of $200 million to $220 million for full year fiscal 2018. This is now 3 years in a row of revenue growth exceeding 15% and adjusted EBITDA growth exceeding 30%.

29

*Mircea Dobre* - Robert W. Baird & Co. Incorporated, Research Division – Senior Research Analyst:

My first question is really surrounding guidance. I – I'm wondering if maybe you can help us refine our assumptions a little bit at segment level. I'm curious as to how you're thinking of segment level growth versus your 12.5% overall growth guidance. And also some color by segment on margin progression.

*Sullivan*:

I think we're going to have more the same, obviously, in 2018. We had a very strong Fire & Emergency performance in '17. That's going to continue. As a matter of fact, our Fire backlog is significantly higher at this time than it was last year even at this time. ***I think all other segments [Commercial and RV], quite frankly, are up, and they're going to be up, obviously, reflecting the type of guidance we gave***. [Emphasis added]

74.     On December 21, 2017 REV filed its 2017 10-K with the SEC, and which was signed by the Director Defendants. In the 2017 10-K, REV trumpeted its production efficiencies, stating that "[w]e believe that our factories are among some of the most efficient and lowest cost production facilities in each of our markets due to the production processes that we employ, our purchasing scale and the high unit volume throughput relative to most of our competitors." The 2017 10-K also affirmed REV's growth strategy, stating in relevant part:

**Our Growth Strategies**

We plan to continue pursuing several strategies to grow our earnings, expand our market share and further diversify our revenue stream, including:

***Drive Margin Expansion Through Controllable Operational Initiatives— Our focus on driving operational improvement initiatives across the organization has enabled the increase of our net income, Adjusted Net Income and Adjusted EBITDA margins by 6 basis points, 139 basis points and 197 basis points, respectively, from fiscal year 2015 to fiscal year 2017***. [Emphasis added]

75.     In its 2017 10-K and discussing its products and markets, REV stated in relevant part:

*Commercial Markets*

REV's Commercial segment addresses a broad variety of products and end markets. The transit and shuttle bus market includes applications such as airport car rental and hotel/motel shuttles, paramedical transit vehicles for hospitals and nursing homes, tour and charter operations, daycare and student transportation, mobility vans for wheelchair users, and numerous other applications. According to industry sources, shipments of cutaway buses (those buses that are up to 35 feet in length) were approximately 14,400 units in 2016. ***We believe the commercial bus markets we serve will sustain positive long-term growth*** supported by growing levels of urbanization which will require increasing commercial bus usage, increased government transportation spending as shown in the chart below, an aging and growing U.S. population driving demand for shuttle buses and mobility vans, a necessary replacement cycle of public and private bus customers and the introduction of new bus products." [Emphasis added]

76.    Additional challenges were on the horizon for REV.  On March 1, 2018 (one month into REV's second quarter) *The New York Times* and other news outlets reported that President Trump would impose tariffs of 25% on steel and 10% on aluminum. On March 8, 2018, President Trump signed proclamations for the new steel and aluminum tariffs.

77.    As generally reported, these tariffs would likely result in an increase in U.S. steel demand and prices.[5]

78.    Based in part on the foregoing, REV knew that the steel tariff would cause both foreign and domestic steel prices to rise because the tariffs gave U.S. steel companies pricing

---

[5]    For example, see the following articles:

March 1, 2018 – Steel mixed on 232, prices seen rising, at https://www.amm.com/Article/3791108/Steel-mixed-on-232-prices-seen-rising.html

March 1, 2018 – U.S. steel, aluminum stocks up on Trump's tariffs, but other industries fear price rises, at https://www.reuters.com/article/us-usa-trade-companies/u-s-steel-aluminum-stocks-up-on-trumps-tariffs-but-other-industries-fear-price-rises-idUSKCN1GD6FH

March 2, 2018 – More automakers warn Trump metal tariffs would boost car prices, at https://www.reuters.com/article/usa-trade-ford-motor/update-1-more-automakers-warn-trump-metal-tariffs-would-boost-car-prices-idUSL2N1QK1T4

March 6, 2018 - US Section 232 tariffs could send HRC prices to $1,000/t, hurt buyers, at https://www.metalbulletin.com/Article/3792187/US-Section-232-tariffs-could-send-HRC-prices-to-1000t-hurt-buyers.html

power to raise their prices to match the newly-raised foreign steel prices. REV also knew that it would be harmed by these tariffs because it needed steel chassis to build its vehicles and increased steel prices would increase REV's steel costs, cause delays in REV's procurement, and negatively affect its earnings.

79. On March 7, 2018, REV published a press release announcing its 1Q 2018 financial results. In that press release REV stated and Sullivan was quoted in relevant part:

> Fiscal year 2018 is off to a good start as we saw continued growth across most of our product categories and we remain on track to meet our full year objectives," said Tim Sullivan, CEO REV Group, Inc. "***We continue to remain highly focused on the execution of our commercial, product and operating strategies to improve profitability as we work towards our long-term goal of an enterprise-wide EBITDA margin in excess of 10 percent***. Additionally, we continued to execute on our disciplined capital allocation strategy with the acquisition of Lance Camper this quarter, which enables our entry into the large and fast growing towables RV market. With a strong backlog of $1.24 billion we expect to continue to see improving operating leverage in the business and thus expect earnings growth to exceed sales growth in fiscal year 2018.

> \* \* \*

> First quarter results were in-line with our expectations and our view of end market demand and macro conditions remains consistent with prior expectations. Therefore, we are reaffirming our prior guidance and are still expecting full fiscal year 2018 revenues of $2.4 to $2.7 billion and Adjusted EBITDA of $200 to $220 million. Based on first quarter results, we are updating our expectation of full fiscal year 2018 net income to be in the range of $90 to $110 million and Adjusted Net Income to be in the range of $110 to $125 million. [Emphasis added]

80. In the March 7, 2018 press release REV surprised the market by revealing that, for the first time since its IPO five quarters prior, its margins and growth rates had contracted in its F&E and Commercial segments.

    (a)    Commercial posted an adjusted EBITDA margin of 3.4% of net sales in the first quarter of 2018, compared to 6.3% in the first quarter of 2017, representing approximately a 290-basis-point year-over-year decline.

(b)    F&E posted an adjusted EBITDA margin of 8.4% of net sales in the first quarter of 2018, compared to 9% in the first quarter of 2017, representing approximately a 60-basis-point year-over-year decline.

81.    REV stated that the margin contraction was a result of poor timing and mix of shipments in its F&E segment, and a shift of timing and lower bus sales in the Commercial segment.

82.    On March 7, 2018, REV also held its 1Q 2018 conference call.  During this call Defendant Sullivan was asked about 2018 guidance and separately about increased steel prices.  The exchange in relevant part states:

*Andrew Millard Casey* - Wells Fargo Securities, LLC, Research Division – Senior Machinery Analyst:

Kind of a question back in line with Jamie's question. We're starting to see some lengthening in order-to-delivery lead times from some of your chassis providers. First, are you seeing that? And then, if so, does that further impact the timing of how you expect to achieve the updated '18 goals?

*Sullivan*:

It's a current situation that we hope does not get worse. But for instance, Mercedes Sprinter chassis have not been EPA approved yet. So there's a bit of delay in receiving those. We do work off a backlog of chassis. ***So in the near term, by near term I mean, our second quarter, we're fine***. But as you can imagine, with our backend-loaded plan, we need a lot of chassis in here in Q3 and Q4. So we have time to react to it. But there's noise with GM also. There's a little bit noise with Ford. It's something that we manage on a regular basis. But we've got some time to react, and we plan to. But right now, ***we don't see that that's going to negatively impact our fiscal year***.

*Andrew Millard Casey* - Wells Fargo Securities, LLC, Research Division – Senior Machinery Analyst:

Okay, Tim. And then in the context of higher input costs that could affect some of the component purchases and even some of those chassis purchases, can you, kind of, remind us about how you price your products, and if you're expecting the – what appears to be a rising material cost environment to impact your ability to achieve the margin expectations not only this year but next year?

33

*Sullivan*:

Yes. This is a top question of everyone in the last few days. Steel and aluminum, which, obviously, are the topics of the day, are less than 5% of our direct spend. And the vast majority, I mean, a very high percentage of what we buy in both steel and aluminum, we get from U.S. suppliers. So ***our exposure to foreign suppliers of steel or aluminum is very low***. And our actual percentage of our total material cost is very low as well. And the other plus that we do have is, we've got aluminum pricing locked in for the remainder of this year. And we've been doing that the last couple of years in aluminum, just because we wanted to make sure that we didn't succumb to some volatility there. The bigger issues is the one that you really addressed, and that's the chassis. We will be extremely diligent on chassis' costs as we move through fiscal 2018. That's where we're going to see the issues. The good news is, I think, is, we can stay ahead of those, we purchase far enough in advance. And if you understand how chassis work, it's kind of a – it's a pool effect that we buy into. ***So we have warnings of any cost adjustments on chassis well in advance of what's happening***. [Emphasis added]

83. The statements in ¶¶ 60, 64, 65, 68, 69, 71-75, 79, and 82 were materially false and misleading when made because (i) REV's factories had materially inefficient production processes; and/or (ii) REV's backlog showed that the Company's growth would contract; and/or (iii) REV's growth strategy, which was reflected in its FY2018 guidance, was not supportable; and/or (iv) REV admitted (in its March 7, 2018 press release) that poor sales mixes and lower profit margins had caused a growth contraction; and/or (v) new tariffs would increase REV's cost of materials.

84. On March 8, 2018, REV stock fell to a closing price of $23.85 per share from a March 7, 2018 closing price of $27.15. These losses would have been greater, but the Director Defendants other misrepresentations investors as detailed herein stemmed this tide.

**THE TRUTH BEGINS TO EMERGE**
**<u>EARNINGS GROWTH WAS CENTRAL TO REVG'S VALUE</u>**

85. On June 6, 2018, after market close, REV published a press release announcing its 2Q 2018 financial results and revised its FY2018 earnings guidance. For 2Q 2018 REV reported adjusted net income of only $15.6 million, or $0.24 per diluted share (a decline of 17.9% from the

second quarter of 2017). For 2Q 2018, REV reported adjusted EBITDA of only $34.1 million for the quarter, (a decrease of 9.2% from the second quarter of 2017) and about 25% below analysts' estimates of approximately $45 million. REV also significantly reduced its fiscal year 2018 earnings guidance. The Company cut Adjusted EBITDA about 15%, from $200 – $220 million to $175 to $185 million; and cut net income about 20%, from $85 – $100 million to $72 to $87 million. REV specifically called investors' attention to the Commercial Segment's shortfall in its press release headline ("…adversely impacted by near term commodity price inflation, supply chain constraints and shortfalls in our Commercial Segment").

86.     The June 6, 2018 press release stated in relevant part:

> Our fiscal second quarter results were below our expectations and were impacted by a number of factors…. In particular, cost inflation across many of the commodities and services we buy was significant in the quarter and due to the length of our backlogs we were not able to mitigate these increases. We estimate the cost inflation will have an approximate $19 million impact on our current fiscal year. Additionally, production and sales at several of our business units were adversely impacted by the availability of chassis. Finally, margins were impacted by lower-than-expected sales of certain higher-content product categories including custom fire apparatus, large commercial buses, and Class A RVs.

87.     Notably, REV's admission that a primary reason it missed its FY2018 earnings guidance related to problems with "large commercial buses and Class A RVs". As alleged herein (*see* ¶¶ 55 and 63), CW1 and Jacobs told Defendant Sullivan and Nolden at the late September / early October Monthly Financial Meeting that the FY2018 guidance was **not** obtainable.

88.     The June 6, 2018 press release also expanded on issues relating to REV's bus business, stating:

> Commercial segment Adjusted EBITDA was $9.5 million in the second quarter 2018 compared to $14.7 million in the second quarter 2017. This decrease was due to reduced volumes of transit and school bus units sold compared to the prior year, and certain higher material and freight costs. Adjusted EBITDA margin was 6.0% of net sales in the second quarter 2018 compared to 9.2% in the second quarter 2017.

The decline in sales and profitability experienced during the second quarter were largely the result of a timing lag between two major contracts in our transit bus business...

89.     On the same date and after REV's disclosures, many analysts slashed price targets and downgraded REV stock, including reports from SunTrust Robinson, BMO Capital Markets, and Morgan Stanley.

90.     On June 7, 2018, REV held its 2Q 2018 conference call, attended by defendant Sullivan, Nolden, and various analysts and investors.   During this call, REV's reduced FY2018 earnings guidance was discussed.  The issues and exchanges include:

(a)     Sullivan stated that part of the reason for the reduced FY2018 earnings guidance was a canceled contract with Collins Bus:

Now for the challenges. 2 of our higher-quality business units struggled in the first 2 quarters this year. In our Commercial segment, our Collins school bus business declined to participate in a very large pre-bid requested by one of our school bus contractors. This adversely affected our first half 2018 performance, but we believe this was ultimately the right decision for the business, and we believe we can recover and get close to plan by the end of fiscal 2018 with new traditional school bus and contractor sales opportunities.

However, Sullivan knew about the Collins Bus issues in 2017 when CW1 informed him at the late September / early October 2017 Monthly Financial Meeting (*see* ¶ 64).

(b)     Nolden stated that revenue from lower margin vehicles was part of the reason for the slashed guidance, and stated:

These circumstances have contributed to this volatility in mix such as the sales profile for our ambulance division in the second quarter was skewed towards lower-margin vehicles. In addition, the mix of fire apparatus sales in the quarter were skewed toward lower content fire apparatus in the form of more retail custom trucks versus larger custom pumpers and aerials.

(c)     Regarding the impact of steel tariffs, Sullivan stated:

The tariffs have also created unintended – unpredicted consequences. As soon as tariffs were suggested, there was a run on many of the commercial

36

chassis we purchase and convert. We are paying extra freight charges to get the chassis we need for the second half shipments. Over the 60 day – the last 60 days alone, this has resulted in approximately a $1 million additional cost. We now need to get certain chassis shipped via truck due to railcar shortages based on what we believe to be abnormal and artificial demand.

(d)     Sullivan also admitted that his 10% EBITDA margin goal for FY2019 was

impossible to reach. The exchange on this issue includes:

*Andrew Millard Casey* - Wells Fargo Securities, LLC, Research Division – Senior Machinery Analyst:

First, a couple of questions. First, your new adjusted EBITDA margin guide, 7.2% at the midpoint. In the past, and you kind of alluded to it earlier, you've outlined fiscal '19 adjusted margin target of about 10% without a lot of market growth. The internal initiatives that you announced you had took in the second quarter seem to be likely to add about 100 basis points on a carryover basis. So it leaves about 200 to get to the 10%. Are the in-place initiatives still supportive to boost EBITDA margins to that 10% next year?

*Sullivan*:

***We're not going to get to 10% next year***. I think 2 things. Obviously, you're experiencing a pretty healthy speed bump that's slowed us down on that path to 10% here in the second quarter. But the other part, the other element to getting to the 10% is a meaningful contribution from spare parts, and we're lagging in spare parts. We plan to continue to move in the right direction. Our goal has not changed. But I can guarantee that we will not get to 10% in 2019, which was our initial goal 2 years ago – 2.5 years ago. But we will get there. And I don't – we'll have more visibility, I guess, on that come fiscal 2019, but it's a goal. We think we can get there. We need some things to happen in a positive way. [Emphasis added]

91.     On June 7, 2018 and on this news the price of REV stock fell $3.39 per share or

nearly 20% to close at $14.52 per share, from its June 6, 2018 closing price of $17.91 per share.

## DEMAND FUTILITY ALLEGATIONS
## FOR THE BOARD OF REV

92.     Plaintiff brings this action derivatively in the right and for the benefit of REV to

redress injuries suffered and to be suffered by REV because of the breaches of fiduciary duty and

other wrongs as alleged herein by the Director Defendants.

93. Plaintiff will adequately and fairly represent the interests of REV and its stockholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

94. Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

95. Because of the facts set forth herein, Plaintiff has not made a demand on the Board of REV to institute this action against the Director Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

96. The REV Board is currently comprised of nine (9) members - Sullivan, Bamatter, Canan, Cusumano, Dutil, Fish, Marvin, Rotroff, and Viola. Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, *five* (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

97. The Director Defendants face a substantial likelihood of liability in this action because they caused REV to issue false and misleading statements concerning the information described herein. Because of their advisory, executive, managerial, and directorial positions with REV, the Director Defendants had knowledge of material non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

98. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses for REV stockholders.

99. The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously

prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and is excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

100.     Any suit by the Board to remedy these wrongs would likely expose the Company to further violations of the securities laws that would result in civil actions being filed; thus, the Board members are hopelessly conflicted in making any supposedly independent determination about whether to sue themselves.

101.     The Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

102.     The Director Defendants authorized and/or permitted the Company to make false statements that disseminated directly to the public and made available and distributed to stockholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT

### Defendant Sullivan

103.     Defendant Sullivan is the CEO of the Company. Defendant Sullivan is also a Director of the Company. Defendant Sullivan is not disinterested or independent, and therefore, is incapable of considering demand because Sullivan (as CEO) is an employee of the Company who derived substantially all of his income from his employment with REV, making him not independent. As such, Sullivan cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

104. This lack of independence and financial benefits received by Defendant Sullivan renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Defendants Canan, Dutil and Viola**

105. Defendants Canan, Dutil and Viola are members of REV's Audit Committee.

106. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee shall review the Company's: "(i) annual consolidated audited financial statements, and the auditors' report thereon; (ii) interim consolidated financial statements, and any reports of the auditors with respect thereto; (iii) the related management's discussion and analysis of the Corporation's financial condition and results of operation ("MD&A"); and (iv) earnings releases and guidance. Specifically, as a member of the Audit Committee, Defendants Canan, Dutil and Viola were tasked with reviewing the Company's compliance with applicable laws and regulations and reviewing and overseeing any policies, procedures and programs designed to promote such compliance.

107. Defendants Canan, Dutil and Viola breached their fiduciary duties of due care, loyalty, and good faith, because as members of the Audit Committee, *inter alia*, they allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the deficiencies described above. Therefore, Defendants Canan, Dutil and Viola face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Bamatter, Cusumano, Fish, Marvin and Rotroff**

108. Defendants Bamatter, Cusumano, Fish, Marvin and Rotroff are all high-ranking officers of AIP (Bamatter, Fish, and Rotroff described as a "partner" of AIP; Marvin and Cusumano described as "Sr. Managing Partner" on the AIP website).

109.     AIP exerted control over REV before, during, and after the Offerings.   AIP owned approximately 90% of REV's voting common stock prior to the IPO.   Immediately following the IPO, AIP owned at least 70% of the Company's outstanding common stock. Following the SPO, AIP continued to own and control a majority of REVG's voting stock.

110.     As stated in REV's Form DEF 14A filed with the SEC on January 24, 2018 (the "2018 Proxy Statement") and also stated in its 2017 10-K:

> Certain funds affiliated with AIP CF IV, LLC, which we collectively refer to as "American Industrial Partners" or "AIP," control more than a majority of the voting power of our common stock eligible to vote in the election of directors. As a result, we are a "controlled company" within the meaning of the corporate governance standards of the NYSE and have elected not to comply with certain corporate governance standards, including the requirements that the board be composed of a majority of independent directors and that the compensation committee and nominating and corporate governance committee are composed entirely of independent directors.

111.     Additionally, AIP and REV are parties to a shareholders agreement that gave AIP outsized influence and control over REV so long as AIP beneficially owns at least 15% of the outstanding shares of REV's common stock.

112.     On or about October 17, 2017 and through the SPO, AIP and defendants Marvin, Fish, Cusumano, and Rotroff, sold approximately $300 million worth of REV stock (11.5 million shares at $27.25 per share).   REV received none of the sale proceeds.   Also, on October 17, 2017 Defendants Cusumano and Marvin sold about 25% of their individual REV holdings for proceeds of over $1.2 million each, and while possessing the insider information described herein.

113.     Based on the foregoing and as further alleged herein, defendants Bamatter, Cusumano, Fish, Marvin and Rotroff face a substantial likelihood of liability and any demand upon them is futile.

41

**Defendants Sullivan, Bamatter, Canan, Cusumano, Dutil, Fish, Marvin, Rotroff, and Viola**

114.     Sullivan, Bamatter, Canan, Cusumano, Dutil, Fish, Marvin, Rotroff, and Viola are each named as a defendant in the Securities Class Action.  Some of these defendants are also defendants in other securities class actions now pending.  Each of these defendants face a substantial likelihood of liability in the Securities Class Action and other pending litigations relating to the facts and matters alleged herein and based thereon, any demand upon them in this action is futile.

## FIRST CAUSE OF ACTION

### (Against the Director Defendants for Breach of Fiduciary Duty)

115.     Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

116.     The Director Defendants owed and owe REV fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe REV the highest obligation of good faith, fair dealing, loyalty and due care.

117.     The Director Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

118.     The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

119.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, REV has sustained significant and actual damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

120.     Plaintiff, on behalf of REV, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against the Director Defendants for Unjust Enrichment

121.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

122.    By their wrongful acts and omissions, the Director Defendants were unjustly enriched at the expense of and to the detriment of REV in the form of salaries, bonuses, and other forms of compensation.

123.    Further, through the SPO, AIP and defendants Marvin, Fish, Cusumano, and Rotroff, sold approximately $300 million worth of REV stock, and defendants Cusumano and Marvin sold about 25% of their individual REV holdings for proceeds of over $1.2 million each, and while possessing the insider information described herein.

124.    Plaintiff, as a stockholder and representative of REV, seeks restitution from the Director Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## THIRD CAUSE OF ACTION

### (Against the Director Defendants for Abuse of Control)

125.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

126.    The Director Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

127.    As a direct and proximate result of the Director Defendants' abuse of control, the Company has sustained significant damages.  As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.

43

128.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.  Plaintiff, on behalf of the Company, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### (Against the Director Defendants for Waste of Corporate Assets)

129.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

130.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public stockholders, the Director Defendants have caused the Company to waste valuable corporate assets by failing to disclose (i) the Company had a material weakness in its internal control over financial reporting; (ii) the Company's disclosure controls and procedures were not effective; and (iii) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

131.    As a result of the waste of corporate assets, the Director Defendants are each liable to the Company.

132.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### (Against the Director Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5)

133.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.    During the Relevant Period, the Director Defendants disseminated or approved public statements that failed to disclose (a) that REV's factories had materially inefficient production processes; (b) that REV's backlog showed that the Company's growth would contract; (c) REV's growth strategy, which was reflected in its FY2018 guidance, was not supportable; (d) that new tariffs would increase REV's cost of materials; and (e) that as a result, the Company's current business metrics and financial prospects were not as strong as it

44

had led the market to believe during the Relevant Period.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

135.    As such, the Director Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud; and

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

136.    As a result of the Director Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## **SIXTH CAUSE OF ACTION**

## **(Against the Director Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9)**

137.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.    SEC Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.   Specifically, the Company's SPO violated section 14(a) of the Exchange Act and SEC Rule 14a-9 because it included materially false and misleading information and failed to disclose (a) that REV's factories had materially inefficient production processes; (b) that REV's backlog showed that the Company's growth would contract; (c) REV's growth strategy, which was reflected in its FY2018 guidance, was not supportable; (d) that new tariffs would increase REV's cost of

45

materials; and (e) that as a result, the Company's current business metrics and financial prospects were not as strong as it had led the market to believe during the Relevant Period.

139.    In the exercise of reasonable care, the Director Defendants should have known that the statements contained in the SPO were materially false and misleading.

140.    The misrepresentations and omissions in the SPO were material to Company stockholders and investors in determining whether to participate in this SPO (and to what extent). The SPO was an essential link in the accomplishment of the continuation of these defendants' continued violation of their fiduciary duties.

141.    The Company was damaged as a result of these defendants' material misrepresentations and omissions in the SPO.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff pray for relief and judgment as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

B.    Against Defendants in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and waste of corporate assets;

C.    Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: January 3, 2019

**O'KELLY ERNST & JOYCE, LLC**

By: */s/ Ryan M. Ernst*
Ryan M. Ernst (#4788)
901 N. Market Street, Suite 1000
Wilmington, DE 19801
Phone (302) 778-4000
Email: rernst@oelegal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel:      (212) 983-1300
Fax:      (212) 983-0383
Email: tjmckenna@gme-law.com
Email: egleston@gme-law.com

*Attorneys for Plaintiff*